IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RALPH S. JANVEY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:10-CV-0725-N |
| | § | |
| JAMES C. BARR, *et al.*, | § | |
| | § | |
| Defendants. | § | |

# ORDER

This Order addresses Defendants Joyce S. Erfurdt and T. Mark Kelly's (collectively, the "Executors") motion for summary judgment [70]. The Court grants the motion.

## I. THE ORIGIN OF THE MOTION

This action arises out of the Ponzi scheme perpetrated by R. Allen Stanford, his associates, and various entities under his control (collectively, "Stanford"). The facts of Stanford's scheme are well established, *see, e.g.*, *Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 188–89 (5th Cir. 2013), and will not be recounted in great detail here. At root, Stanford's scheme entailed the sale of fraudulent certificates of deposit ("CDs") from an offshore bank located in Antigua known as Stanford International Bank Limited ("SIBL"). Although Stanford represented to investors that the CD proceeds were only invested in low-risk, high-return funds, in reality they were funneled into speculative private equity investments and used to fund Stanford's extravagant lifestyle.

ORDER – PAGE 1

Plaintiff Ralph S. Janvey (the "Receiver"), the court-appointed receiver for the Stanford entities,[1] brings this action seeking to recover CD proceeds transferred by the Stanford entities to various Stanford investors. The action is based on the Texas Uniform Fraudulent Transfer Act ("TUFTA"), TEX. BUS. & COM. CODE ANN. §§ 24.001 – 24.013. At issue in this motion are the Receiver's claims against the Executors, in their capacities as independent co-executors of the estate of Michael Halbouty (the "Estate"). Halbouty was a Stanford investor who passed away prior to the dissolution of Stanford's scheme. After his death, the proceeds of his Stanford investments were cashed out and distributed by his Estate. The Receiver seeks recovery from the Estate, and the Executors move for summary judgment, arguing that the Estate is not the proper target of the Receiver's TUFTA action.

## II. THE FACTUAL BACKGROUND

The facts pertaining to the Receiver's claim against the Estate are relatively simple. In 2004, Halbouty purchased a Stanford CD in the amount of $700,000.00. Decl. T. Mark Kelly ¶ 1, *in* App. Supp. Def.'s Mot. Summ. J. [72]. Halbouty passed away shortly thereafter, and Halbouty's last will and testament was admitted to probate. *Id.* ¶ 2. After the will was admitted to probate, a codicil was discovered that provided for a number of specific bequests from the Stanford accounts, and further provided that any funds remaining in the accounts were to be distributed to Halbouty's two grandchildren. *Id.* ¶ 3. During the

---

[1]The Receiver's rights and obligations as representative for the Stanford entities are laid out in detail in this Court's Second Amended Order Appointing Receiver [1130], *in SEC v. Stanford Int'l Bank Ltd.*, Civil Action No. 3:09-CV-0298-N (N.D. Tex. filed Feb. 17, 2009).

administration of the Estate, Halbouty's wife, his decedents, the Executors, and trustees named in the will to administer certain trusts executed a distribution agreement that stated all specific bequests were to be paid from funds held in the Stanford CD account. *Id.* ¶ 4. After these bequests were satisfied, the proceeds of the SIBL CD – which is the subject of this action – were distributed to Halbouty's grandchildren pursuant to the terms of the codicil. *Id.* The transfers occurred on August 2, 2007 via wire transfers from the SIBL account to the grandchildren's respective bank accounts. *Id.* ¶ 5. Nearly a year and a half later, the SEC shut down Stanford's operations and the Receiver took control of the Stanford entities. *Id.* ¶ 6.

### III. SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, "he must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). When the nonmovant

bears the burden of proof, the movant may demonstrate entitlement to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25. Once the movant has made this showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Moreover, "[c]onclusory allegations, speculation, and unsubstantiated assertions" will not suffice to satisfy the nonmovant's burden. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (en banc). Indeed, factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Hous.*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### IV. THE COURT GRANTS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TUFTA permits a creditor to avoid a transfer made by the debtor "with actual intent to hinder, delay, or defraud any creditor of the debtor . . . ." TEX. BUS. & COM. CODE ANN. § 24.005(a)(1). TUFTA further specifies that the creditor may recover against "the first transferee of the asset or the person for whose benefit the transfer was made . . . ." *Id.* § 24.009(b)(1). The Executors argue that under the Fifth Circuit's interpretation of analogous

ORDER – PAGE 4

law, the Estate does not qualify as "the first transferee" of the disputed assets, "or the person for whose benefit the transfer was made."

### *A. The Estate Was Not the First Transferee*

TUFTA does not define what it means to be a "first transferee." However, in analyzing the same issue under the Bankruptcy Code's fraudulent transfer statute,[2] the Fifth Circuit adopted the "dominion or control" test. *In re Coutee*, 984 F.2d 138, 140–41 (5th Cir. 1993). "Under this test, a party that receives a transfer directly from the debtor will not be considered the initial transferee unless that party gains *actual dominion or control over the funds*."[3] *Id.* at 141 (emphasis added) (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)). The Fifth Circuit cited language from the Seventh Circuit's decision providing that "an entity does not have dominion over the money until it is, in essence, 'free to invest the whole [amount] in lottery tickets or uranium stocks' if it wishes." *Id*. (alteration in original) (quoting *Bonded*, 838 F.2d at 894). Applying the dominion or control test to the facts before it, the Fifth Circuit concluded the defendant–law firm did not have dominion or control over the disputed funds because the funds "were held merely in a fiduciary capacity for [a third party]." *Id.* "The only control exercised over the funds was the control delegated to the law firm by the [third party]." *Id.*

---

[2]The Court has previously found it appropriate to look to analogous bankruptcy law when construing actions under the Stanford federal equity receivership. *See* Order 6–9, July 30, 2014 [1093], *in Janvey v. Alguire*, No. 3:09-CV-0724-N (N.D. Tex. filed Apr. 20, 2009).

[3]At least one Texas court of appeals has extended *Coutee* to fraudulent transfer actions under TUFTA. *Newsome v. Charter Bank Colonial*, 940 S.W.2d 157, 165 (Tex. App. – Houston [14th Dist.] 1996, writ denied).

Applying the dominion or control test to the undisputed facts in this case, the Court concludes the Estate lacked the necessary dominion or control to be considered a first transferee under TUFTA. At no point did the Estate have the legal authority to put the SIBL funds to its own use. Rather, pursuant to the terms of Halbouty's last will and testament and the codicil specifying the recipients of the SIBL CD proceeds, the Estate had no legal option but to distribute the proceeds as commanded. *See* TEX. ESTATES CODE ANN. § 351.102(b) ("The personal representative shall deliver the property, books, and papers [of the Estate] that are in the representative's possession to the person or persons legally entitled to the property, books, and papers . . . ."). Thus, although the Estate had possession of the disputed assets, it did not have dominion and control over those assets such that it could be considered the first transferee.

The Receiver cites a number of authorities standing for the proposition that the executor of an estate has possession and control over the estate's assets. *See* TEX. ESTATES CODE ANN. § 101.003 ("[T]he executor . . . has the right to possession of the estate as the estate existed at the death of the testator or intestate . . . ."); *Gorham v. Gates ex rel. Estate of Badouh*, 82 S.W.3d 359, 365 (Tex. App. – Austin 2002, pet. denied) (noting an estate administrator "holds legal title and a superior right to possess estate property and to dispose of it as necessary to pay debts of the estate"). But the right to possess and put to limited, legally constricted use is not the standard under the dominion or control test. Dominion or control implies the possessor's right to "simply keep the money" or "put the funds to its own use," not to exercise "the control delegated to [it]" by another party. *Coutee*, 984 F.2d 141.

Here the Estate had control over the disputed assets only for the limited purposes provided by Texas law and Halbouty's will and codicil. It did not have the right to put the funds to its own use.

The Receiver also relies on *Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688 (7th Cir. 2010), a Seventh Circuit decision that applied *Bonded* to a fraudulent transfer action against a trustee–bank. In *Paloian*, the bankruptcy trustee – Paloian – sued LaSalle Bank in its capacity as trustee for a pool of security interests. *Id.* at 690–91. The security interests were held by various third parties, which LaSalle Bank argued were the actual initial transferees under *Bonded*. *Id.* at 691. The Seventh Circuit characterized *Bonded* as having "adopted an approach that tracks the function of the bankruptcy trustee's avoiding powers: to recoup money from the real recipient of preferential transfers." *Id.* The court then went on to hold that:

> In this situation, the real recipient is LaSalle Bank, which is the trustee of the securities pool. In American law, a trustee is the legal owner of the trust's assets. Although LaSalle Bank has duties to the trust's beneficiaries (the investors) concerning the application of funds, the assets' owner remains the appropriate subject of a preference-avoidance action. If LaSalle Bank must hand $10 million over to the bankruptcy estate, it will draw that money from the corpus of the trust, not from the Bank's corporate assets. This means that the money really comes from the trust's investors-the persons 'for whose benefit [the] transfer was made'. Instead of requiring the bankruptcy trustee to sue thousands of investors who may have received interest payments that were increased, slightly, by money from the [bankruptcy debtor's] coffers, a single suit suffices.

*Id.* at 691–92 (internal citations omitted).

The holding in *Paloian* was thus based on equitable considerations that are not present here. LaSalle Bank in *Paloian* still had possession of the disputed assets. Moreover, even

ORDER – PAGE 7

if the bank was not technically the "initial transferee," requiring it to turn over the assets was simply a more efficient way of forcing the investors, the "real parties in interest" to turn the assets over. Indeed, the investors had not received any substantial portion of the trust assets, and any fraudulent transfer action against them would be only for the small amounts of interest they had received from the trust's investments. *Id.* at 692. The situation here is materially different. The Estate is not investing the corpus of the SIBL CD proceeds for the benefit of Halbouty's beneficiaries; rather, the entirety of the SIBL CD proceeds have been distributed. Common sense dictates that the Estate lacked "dominion or control" over the SIBL CD proceeds.[4]

### B. The Estate Was Not the Party For Whose Benefit the Transfers Were Made

In addition to the "first transferee of the asset," TUFTA also permits entry of judgment against "the person for whose benefit the transfer was made . . . ." TEX. BUS. & COM. CODE ANN. § 24.009(b)(1). In general, parties for whose benefit a transfer is made are those "'entities that benefit as guarantors of the debtor, or otherwise, without ever holding the funds.'" *In re Heritage Org., L.L.C.*, 413 B.R. 438, 495 (Bankr. N.D. Tex. 2009) (quoting *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Mayerson & Casey*, 130 F.3d 52, 57 (2d Cir. 1997)). "[A]s a general rule, initial transferees and entities for whose

---

[4]Also apparently relevant to the court's decision in *Paloian* was the fact that although the bank owed certain duties to the investors, it retained some discretion in how the funds would be invested. 619 F.3d at 691–92. Here, the Estate retained no such discretion. Its only legal use of the CD proceeds was to apply them to the debts of the Estate, and then to distribute them according to the terms of Halbouty's last will and testament, and the codicil.

ORDER – PAGE 8

benefit the initial transfer was made are mutually exclusive." *Id.* (citing *In re Red Dot Scenic, Inc.*, 293 B.R. 116 (S.D.N.Y. 2003)). Beneficiary liability may also be imposed on corporate shareholders where the corporation is the initial transferee, but is nothing more than a shell entity to hold assets for shareholders. *See In re Pace*, 456 B.R. 253, 278 n.8 (Bankr. N.D. Tex. 2011) (collecting cases). Finally, the person for whose benefit the transfer was made is often simply the debtor himself, who by transferring the funds erases an existing debt. *See Citizens Nat'l Bank of Tex. v. NXS Constr., Inc.*, 387 S.W.3d 74, 84 (Tex. App. – Houston [14th Dist.] 2012, no pet.).

The Receiver contends the Estate was the person for whose benefit the transfer was made because it received, as consideration for distributing the CD proceeds to the specified beneficiaries, full release and indemnification from other beneficiaries and interested parties. *See* Br. Supp. Resp. Mot. Summ. J. 9–10 [95]. The Receiver further notes that under an indemnification agreement that attended the distribution of the CD proceeds, the Executors received indemnification from future suits, arguably including the Receiver's current suit, concerning the proceeds.

The Court holds that the Estate is not the "person for whose benefit the transfer was made." First, the Estate does not fall in to any of the paradigmatic categories discussed above. It was not a guarantor of Stanford's debts; it was not a shareholder of a corporation that received transfers; and obviously, it was not the debtor itself. The Court also finds significant that the rationales for executing the indemnification agreements were apparently unrelated to concerns about the legitimacy of Stanford's operation. The indemnification

ORDER – PAGE 9

agreement was executed in January of 2007, *see* Resp. App. 46, over two years before Stanford's collapse. The logical conclusion is that the indemnification agreement arose out of concerns pertaining only to the administration of the estate. The import of this conclusion is that the Estate was not acting to protect either itself or the CD proceeds from future actions like this one. Based on these considerations, the Court finds the Estate was not a party for whose benefit the transfers were made. As a matter of law, the Receiver cannot prevail on his TUFTA claims against the Executors.

### *C. The Estate Was Not Unjustly Enriched*

The Receiver also brings a claim against the Executors for unjust enrichment. To the extent such a claim exists in Texas,[5] it requires proof that the defendant "has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). Moreover, the benefit must be one "which it would be unconscionable to retain." *City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 731 (Tex. App. – Fort Worth 2008, pet. dism'd).

The Executors argue the unjust enrichment claim must fail because they retained no benefit. In response, the Receiver contends that the Executors received benefits associated with the indemnification agreements. Br. Supp. Resp. Mot. Summ. J. 11 & n.4. Unjust enrichment is a claim that provides for return of the unconscionably procured benefit, or

---

[5]It remains an unsettled question among Texas courts of appeals whether unjust enrichment is an independent cause of action. *See, e.g.*, *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App – Corpus Christi 2002, pet. denied) ("Moreover, unjust enrichment is not a distinct independent cause of action but simply a theory of recovery.").

requires a party to make restitution for those benefits. *City of the Colony*, 272 S.W.3d at 731. The benefit of the indemnification agreements, however, is not something that could or would be returned to the Receiver. The Receiver did not provide the Executors with the indemnification agreements. The Receiver's claim is for the SIBL CD proceeds, but the Executors and the Estate no longer have those proceeds. To the extent the Estate was "enriched" by its receipt of the SIBL CD proceeds, its enrichment was only temporary. The Estate was obligated to pass those benefits to other parties, and it did so. Accordingly, the Court concludes the Estate retained no benefit, and the Receiver's claim for unjust enrichment must therefore fail as a matter of law.

## CONCLUSION

The Court grants the Executors', in their capacities as co-executors for the Estate of Michael Halbouty, motion for summary judgment.

Signed August 5, 2015.

_____
David C. Godbey
United States District Judge